ROY HARRELL v. STATE.

No. A.-6731. Opinion Filed June 15, 1929.

(278 Pac. 404.)

D. B. Madden and Walter Hubbell, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, P. J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Cotton county of manslaughter in the first degree, and his punishment fixed at imprisonment in the state penitentiary for a term of 10 years.

It appears from the record that at the time charged defendant was 19 years of age, and Charlie Hughes, the person killed, was 25 years of age. A brother of Hughes had married a sister of defendant, and defendant and Hughes had been acquainted and friends for several years. At the time of the difficulty, Hughes was hauling grain from a threshing machine, and defendant came there in a truck for the purpose of also getting employment in hauling away grain. They engaged in a conversation, and a difficulty followed, in which defendant twice cut Hughes with a knife, inflicting wounds from which he died about 2 weeks later. Defendant then left the state, but voluntarily returned in a few days. The state offered evidence that the conversation which led up to the difficulty was in reference to some beer which on the night preceding defendant had sold to a party of which deceased was a member. Defendant testified that some

days before deceased had insulted his wife, and that he demanded an apology, which led up to the difficulty; that at the time 'he cut deceased deceased had his arm about his neck, choking him; and that he used the knife in order to cause him to desist.

It is first argued that the court admitted incompetent evidence, prejudicial to defendant. This is directed to testimony in reference to the sale of beer by defendant to deceased or to a party of which deceased was a member on the night preceding the fatal difficulty. The testimony for the state was that, when the defendant approached the deceased at the threshing machine he asked him how he liked the beer the night before, and that deceased replied that it was all right so far as he was concerned, but that he did not like it, and that he had one bottle left, and that, if it was all like that, he would have enough to do him all summer. Defendant answered, calling deceased a son of a bitch, and informed him that he could make just as good beer as he could, and then hit deceased, and said, "I am a mean, fighting son-of-a-bitch."

On cross-examination defendant testified that nothing was said about beer at the time of the difficulty. On cross-examination the following appears:

"* * * Q. I will ask you, Dude, if Charlie Hughes didn't buy—didn't come down to your house the night before this cutting? A. Yes, he came to my house the night before that—to my father's house. * * *

"Q. I will ask you if you didn't sell to these same men that night—I will ask you if you didn't sell Charlie Hughes some beer that night and also in the presence of Charlie Hughes sell some other men all told including 23 bottles of beer there that night? A. No, sir; I didn't sell Charlie Hughes any beer.

"Q. Did you give him any beer? A. No, sir, I never did.

"Q. That didn't occur. You didn't have any beer on that occasion did you? (Objection was sustained.)

"Q. Dude, I will ask you if on this night before the trouble took place the next day, if you didn't sell to Charlie Hughes, M. M. Cook, Ted Edmondson and Leonard Newsome 23 bottles of beer? (Objection was overruled.)

"Q. How is that? A. I didn't sell Charlie Hughes any beer.

"Q. Did you sell any of those three men any beer in the presence of Charlie Hughes? (Objection sustained.)

"By the Court: You may ask him if he sold to the crowd in which Hughes was a part.

"Q. Did you sell to M. M. Cook, Ted Edmondson and Leonard Newsome any quantity of beer in the crowd in which Charlie Hughes was in? A. No, sir.

"Q. He was with them? A. He wasn't in the crowd with us at all.

"Q. He wasn't present at the time? A. Charlie Hughes was standing at the back of the truck or out there at the gate somewhere, and we was all in front of the tire with a lantern, was tying it on. * * *

"Q. Go ahead and answer. How much did you sell them? A. I don't know how many bottles of beer they got. I didn't sell them anything.

"Q. Did you give it to them? A. Yes, sir. * * *

"Q. Did Hughes drink any of the beer you furnished on that occasion? A. I can't say about that. * * *"

There was evidence of other witnesses that on the occasion in question defendant sold or furnished the party of which deceased was a member a quantity of beer. This testimony, we think, is competent as tending to throw

light upon a motive for the difficulty and as explaining and showing the relation of the parties and the origin of the fatal difficulty. This testimony was limited by the court in his instructions to this specific purpose. Wise v. State, 34 Okla. Cr. 284, 246 Pac. 656; Reeves v. State, 36 Okla. Cr. 409, 255 Pac. 162.

Complaint is further made that the verdict is a nullity; that, after the verdict had been received and the jury discharged, and had separated and mingled with the public, they were recalled by the court, sent again to the jury room, and that they there attempted to correct their verdict by writing in the words "in the first degree" after the word "manslaughter". The record upon this point discloses that the court submitted to the jury only the crime of murder and of manslaughter in the first degree. When the verdict was first returned, it read:

"We, the jury impaneled and sworn in the above entitled cause do upon our oaths find the defendant guilty of manslaughter but are unable to agree upon his punishment and therefore leave his punishment to be fixed by the court."

After the verdict was thus returned and the jury were excused, the county attorney called the court's attention to the fact that the words "in the first degree" were not in the verdict. The court thereupon directed that the jury be called back, and said to them:

"I notice in preparing the verdict I submitted to you only the question if you found the defendant guilty of manslaughter, and the only degree of manslaughter submitted to you under the instructions and that was intended to have been put in the verdict at that time, and I take it you considered nothing else since nothing else was submitted to you, was manslaughter in the first degree, and in fact you were not authorized to render a verdict of

manslaughter other than in the first degree and it will be proper for that to be put in. I am not satisfied whether it is necessary for that to be stated or not, but I am going to submit it to you so that you can write it in right after the word 'manslaughter,' 'in the first degree.' I take it you would consider nothing else and you may then write those words in after the word 'manslaughter', 'in the first degree'."

Defendant's counsel then objected to the verdict as amended and returned, and on the motion for a new trial assigned this action as error. Three of the jurors made affidavit that they had walked out of the courthouse upon the street when recalled by the deputy sheriff. The only showing of any conversation with any one was that the county assessor inquired of one juror if they had been excused, and he answered they had. In Petitti v. State, 2 Okla. Cr. 131, 100 Pac. 1122, it was held that, when the jury had returned its verdict finding a defendant not guilty, and had been discharged and mingled with the public, the court could not recall the members and require or permit them to impeach their verdict by showing they intended to find the defendant guilty instead of not guilty. This is the only case in this jurisdiction called to our attention where it was attempted to recall the jury and to change a verdict after the jury had been discharged. There are numerous cases where the court has considered the attempt to impeach or explain a verdict by jurors. We find no very recent authorities on this point, but the following sustain the rule announced:

Mills v. Com., 7 Leigh (Va.) 751, decided December, 1836, where it is held:

"On a trial for grand larceny, the jury find the prisoner guilty, but the verdict ascertains no term of imprisonment; the court tells the jurors they are discharged, but

they are called back instantly, before any of them had left the courthouse, except one, who had gone a short distance accompanied by a deputy sheriff; and they then ascertain the term of imprisonment: Held, the verdict must be set aside, and a new trial awarded."

People v. Lee Yune Chong, 94 Cal. 379, 29 Pac. 776, syllabus 1:

"Where the jury, in a criminal case, after rendering a defective verdict, which is accepted by the court, are discharged, their functions as jurors cease, and they cannot be recalled, and directed to find a new verdict as they intended; and, if such proceedings are taken, they and the new verdict are a nullity."

In Allen v. State, 85 Wis. 22, 54 N. W. 999, it was held:

"Where, on an information alleging that defendant did feloniously and of his malice aforethought kill and murder W., the jury find defendant guilty as charged in the information, and are discharged, the verdict cannot be afterwards corrected by the court, or by reassembling the jury and ascertaining from them what degree of murder they intended to find."

See, also, Farley et al. v. People, 138 Ill. 97, 27 N. E. 927; State v. Dawkins et al., 32 S. C. 17, 10 S. E. 772.

The statute providing for the forms of verdict is found in sections 2738 to 2740, inclusive, Comp, Stat. 1921, and these sections are to be considered together. Bowlegs v. State, 9 Okla. Cr. 69, 130 Pac. 824. The proceedings in this case, that is, the recalling of the jury after it had been discharged and attempting to amend the verdict cannot be upheld.

After the jury was discharged and had separated and had left the immediate presence of the court, their functions as jurors had ceased. The court did not have the

power to recall them and invest them with the functions of a jury. His attempting to do so and their attempting to act as such was a nullity. If a defect or informality in a verdict had been discovered after announcement of the discharge of the jury, but before they had separated, the court might then and there, however, set aside his announcement of discharge and the jury have further acted. Sections 2742 and 2743, Comp. Stat. 1921; Abbott's Criminal Trial Brief (2d Ed.) p. 730, § 18; Petitti v. State, supra.

This action of the court in attempting to require the jury and their attempting to amend the verdict being a nullity, the verdict as found in the first place and received by the court is not affected by the subsequent proceedings (People v. Lee Yune Chong, supra), and, if the verdict as returned in the first place is sufficient, the judgment based thereon should be affirmed.

Since the form of the verdict was not objected to at the time it was returned in the first place, and it was not challenged in its original form until the filing of a motion for a new trial, all reasonable intendments and inferences should be indulged to sustain it as to form. We are of the opinion that, so considered, it can properly be upheld. While the information charges murder, which includes the two degrees of manslaughter, yet the instructions of the court submitted to the jury only the offense of murder and the included crime of manslaughter in the first degree. So far as the jury were concerned, no crime was involved except murder and manslaughter in the first degree, and, when by their verdict they found defendant guilty of manslaughter, it was necessarily a finding of manslaughter in the first degree. No other matter, crime, or degree of crime was under consideration by them. So

considered, the verdict clearly discloses that the jury did not find the defendant guilty of murder, but did find him guilty of manslaughter in the first degree.

The judgment is therefore affirmed.

DAVENPORT and CHAPPELL, JJ., concur.